1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

                            ----oo0oo----

11

12

STARBUCKS CORPORATION, a            Civ. No. 2:13-1754 WBS CKD
13  corporation,

14              Plaintiff,           MEMORANDUM AND ORDER RE: MOTIONS
                                     FOR SUMMARY JUDGMENT
15       v.

16  AMCOR PACKAGING DISTRIBUTION,
    a corporation; AMCOR
17  PACKAGING (USA), INC., a
    corporation; and PALLETS
18  UNLIMITED, LLC, a limited
    liability company,

19
                Defendants.
20

21                          ----oo0oo----

22          Plaintiff Starbucks Corporation ("Starbucks") filed

23  this action against defendants Amcor Packaging Distribution,

24  Amcor Packaging (USA), Inc. (collectively, "Amcor"), and Pallets

25  Unlimited, LLC ("Pallets Unlimited"), alleging that defendants

26  supplied it with defective wooden pallets that caused mold to

27  develop on its unroasted ("green") coffee and resulted in losses

28  of approximately $5.3 million.  (Compl. ¶¶ 9-11 (Docket Nos. 1,

                                  1

6, 7).)  The matter is now before the court, pursuant to Federal Rule of Civil Procedure 56, on (1) Starbucks' motion for partial summary judgment against Amcor on certain purportedly invalid provisions of the contract between Starbucks and Amcor, (Docket No. 119); and (2) Amcor's cross-motion for summary judgment on all of Starbucks' claims, (Docket No. 111).

I.   <u>Factual and Procedural Background</u>

Starbucks is an international company that distributes coffee products.  Starbucks operates a coffee bean roasting facility in Minden, Nevada called the Carson Valley Roasting Plant ("CVRP").  Ozburn-Hessey Logistics, LLC ("OHL") owned and operated a warehouse in Sparks, Nevada ("OHL Warehouse") where Starbucks' green coffee was stored on wooden pallets before being transported to CVRP for roasting.  (Compl. ¶¶ 8-11.)[1]  Between December 14, 2011 and February 17, 2012, Starbucks contracted with Amcor, a manufacturer and distributor of packaging materials, to purchase 9,480 wooden pallets for storing its green coffee at the OHL Warehouse.  Starbucks provided Amcor with a specification sheet stating that the wooden pallets must consist of lumber that was kiln-dried to a moisture content of less than 19% ("Specification Sheet").  (<u>Id.</u> Ex. B.)  Amcor subcontracted with Pallets Unlimited to manufacture the wooden pallets and deliver them to the OHL Warehouse.  (<u>Id.</u> ¶¶ 7-11.)

---

[1]    Pallets Unlimited filed a third-party claim for equitable indemnity against OHL, (Docket No. 46), and OHL subsequently moved for summary judgment on that claim, (Docket Nos. 104-107).  On June 13, 2016, OHL and Pallets Unlimited filed a notice of settlement and request to take OHL's summary judgment motion off the calendar.  (Docket No. 128.)

1    Upon delivery, OHL, acting on behalf of Starbucks,

2  visually inspected the wooden pallets for damage, but did not

3  measure the pallets for moisture content.  Except for one

4  shipment of wooden pallets that were found to be wet and returned

5  to Pallets Unlimited, OHL accepted all of the pallet deliveries

6  on behalf of Starbucks.  Following the deliveries, Amcor issued

7  invoices to Starbucks for the sale of the wooden pallets

8  ("Invoices").  Each Invoice included a provision at the bottom as

9  follows:

10      The following is made in lieu of all warranties, express
        or implied: seller's only obligation shall be to replace
11      such quantity of the product proved to be defective.
        Seller shall not be liable for any injury, loss or
12      damage, direct or consequential, arising out of the use
        or inability to use the product.  Before using, user
13      shall determine the suitability of the product for his
        intended use and the user assumes all risk and liability
14      whatsoever in connection therewith.  The foregoing may
        not be changed except by agreement signed by an officer
15      of seller.

16  (the "Disclaimers").  (Id. ¶ 8, Ex. A.)

17    Starbucks paid these Invoices and loaded 68,000 bags of

18  green coffee on the wooden pallets it purchased from Amcor for

19  storage at the OHL Warehouse and subsequent transportation to

20  CVRP for roasting.  (Id. ¶ 9.)  On February 9, 2012, OHL

21  personnel discovered mold growing on some of the wooden pallets

22  in the OHL Warehouse.  Shortly thereafter, Starbucks discovered

23  mold on green coffee, coffee bags, and wooden pallets that were

24  delivered to CVRP from the OHL Warehouse.  (Id.)

25    Starbucks retained independent surveyors to conduct an

26  investigation into the source of the mold.  The surveyors

27  determined that many of the wooden pallets Starbucks purchased

28  from Amcor did not meet specifications because they were

3

1   constructed with lumber whose moisture content was considerably

2   above the 19% requirement.  (Parikh Decl. Exs. 14-15, 19 (Docket

3   Nos. 111-5 to -27).)  The surveyors concluded that the "formation

4   of mold on the affected Bags [and] Green Coffee Beans was

5   apparently due to the release of moisture from the lumber

6   materials used in construction of the Pallets, principally due to

7   excessive moisture contained within the lumber."  (Id. Ex. 19 at

8   5.)

9        Upon Starbucks' request, Amcor picked up all of the

10  wooden pallets it had sold to Starbucks from the OHL Warehouse

11  and sent them back to Pallets Unlimited.  (Coons Decl. ¶¶ 11-12,

12  Ex. 25 (Docket Nos. 111-28 to -32).)  Starbucks demanded that

13  Amcor reimburse it for the damage to its coffee beans caused by

14  the mold.  Amcor disputed its liability for any damage to

15  Starbucks' coffee as precluded under the Disclaimers contained in

16  the Invoices it issued Starbucks for the wooden pallets.  (Id.

17  ¶ 16; Compl. ¶ 12.)

18       Starbucks filed this action on August 23, 2013,

19  alleging claims against Amcor for (1) breach of contract, and (2)

20  breach of the express warranty that the wooden pallets would meet

21  Starbucks' moisture content specifications.  (Compl. ¶¶ 26-34.)

22  Starbucks additionally asserted claims against Amcor and Pallets

23  Unlimited for (3) breach of the implied warranty of

24  merchantability, (4) breach of the implied warranty of fitness

25  for a particular purpose, (5) strict products liability, and (6)

26  negligence.  (Id. ¶¶ 13-25, 35-38.)

27       Starbucks moves for partial summary judgment against

28  Amcor that the Disclaimers in the Invoices are unenforceable and

4

1  invalid as a matter of law because Starbucks neither bargained

2  for nor assented to them.  (Docket No. 119.)  Starbucks seeks a

3  ruling that Amcor is precluded from invoking the Disclaimers as a

4  defense against Starbucks' claims.  Starbucks also seeks to

5  strike Amcor's thirteenth and forty-ninth affirmative defenses,

6  which are premised on the Disclaimers.

7       Amcor's thirteenth affirmative defense states that

8  Amcor "disclaimed, negated and excluded each and every warranty

9  of the type and character alleged in the complaint so as to bar

10  recovery based on any such warranty."  (Amcor's Ans. at 9 (Docket

11  No. 14).)  Amcor's forty-ninth affirmative defense states that

12  "the warranties, disclaimers and any other exclusions in the

13  invoices or contract between plaintiff and [Amcor] is valid and

14  enforceable."  (Id. at 13.)  Amcor has filed a cross-motion for

15  summary judgment on all of Starbucks' claims.  (Docket No. 111.)

16  II.  Legal Standard

17       A party may move for summary judgment on a "claim or

18  defense."  Fed. R. Civ. P. 56(a).  Summary judgment is proper if

19  there is no genuine issue of material fact and the moving party

20  is entitled to judgment as a matter of law.  Id.; Summers v.

21  Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997).  A

22  material fact is one that could affect the outcome of the case.

23  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A

24  genuine issue exists if the evidence produced would allow a

25  reasonable trier of fact to reach a verdict in favor of the non-

26  moving party.  Id.

27       The moving party bears the initial burden of

28  establishing that no genuine issue of material fact exists as to

1    the particular claim or defense.  Id. at 256.  Where the moving

2    party seeks summary judgment on a claim or defense for which it

3    bears the burden of proof at trial, it must affirmatively

4    demonstrate that no reasonable trier of fact could find for the

5    non-moving party on that claim or defense.  Soremekun v. Thrifty

6    Payless Inc., 509 F.3d 978, 994 (9th Cir. 2007).  If summary

7    judgment is sought on a claim or defense for which the non-moving

8    party bears the burden of proof at trial, the moving party must

9    either (1) produce evidence negating an essential element of the

10   non-moving party's claim or defense, or (2) show that the non-

11   moving party cannot produce evidence to support an essential

12   element of its claim or defense.  Celotex Corp. v. Catrett, 477

13   U.S. 317, 322-23 (1986).

14          Once the moving party has met its initial burden, the

15   burden shifts to the non-moving party to produce concrete,

16   specific evidence establishing a genuine issue of material fact.

17   Id. at 324; Anderson, 477 U.S. at 256.  To carry this burden, the

18   non-moving may not rely "solely on conclusory allegations

19   unsupported by factual data."  Taylor v. List, 880 F.2d 1040,

20   1045 (9th Cir. 1989).  Rather, it must produce sufficient

21   evidence beyond the pleadings that would allow a reasonable trier

22   of fact to find in its favor.  Anderson, 477 U.S. at 256.  If it

23   does so, then "there is a genuine issue of fact that requires a

24   trial."  Id. at 257.

25          In ruling on a motion for summary judgment, the court

26   may not weigh the evidence, make credibility determinations, or

27   determine the truth of the matters asserted, and it must view all

28   inferences drawn from the factual record in the light most

1   favorable to the non-moving party.  Id. at 249, 255; Matsushita

2   Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

3   "Thus, although the court should review the record as a whole, it

4   must disregard all evidence favorable to the moving party" unless

5   that evidence is "uncontradicted and unimpeached" and "comes from

6   disinterested witnesses."  Reeves v. Sanderson Plumbing Prods.,

7   Inc., 530 U.S. 133, 151 (2000) (citation omitted).

8            Where parties submit cross-motions for summary

9   judgment, the court must consider each motion separately to

10   determine whether either party has met its burden, "giving the

11   nonmoving party in each instance the benefit of all reasonable

12   inferences."  ACLU of Nevada v. City of Las Vegas, 333 F.3d 1092,

13   1097 (9th Cir. 2003).

14   III. Discussion

15        A.   Starbucks' Motion for Summary Judgment

16            "[F]ederal courts sitting in diversity apply state

17   substantive law and federal procedural law."  Gasperini v. Ctr.

18   for Humanities, Inc., 518 U.S. 415, 427 (1996).  The court will

19   thus apply California substantive law here.  The interpretation

20   of a contract is a question of law.  United States v. King

21   Features Entm't, Inc., 843 F.2d 394, 398 (9th Cir. 1988).  The

22   California Uniform Commercial Code (the "Code") applies to all

23   "transactions in goods."  Cal. Com. Code § 2102.[2]  Goods are

24   defined as "all things (including specially manufactured goods)

25   which are movable at the time of identification to the contract

26

27   ────────────────

28        [2]    All statutory references are to the California Uniform
     Commercial Code unless otherwise specified.

1    for sale."  Id. § 2105(1).  It is undisputed that the wooden

2    pallets Amcor sold to Starbucks are "goods" within the meaning of

3    the Code.  The Code thus governs the parties' contract here.

4           Starbucks argues that the Disclaimers are not part of

5    the parties' contract, are unconscionable, and are invalid

6    because they materially alter the parties' contract.  Amcor, on

7    the other hand, contends that the Disclaimers are part of the

8    parties' contract because Starbucks had assented to them during

9    the parties' prior course of dealing; thus, Starbucks' remedy for

10   breach of contract here is limited to the exclusive remedy

11   provided in the Disclaimers.

12          Amcor argues that Starbucks is precluded from

13   challenging the validity of the Disclaimers because Starbucks

14   judicially admitted in its Complaint that Amcor's Invoices were

15   part of the parties' contract for the wooden pallets.  (Amcor's

16   Mem. at 14-15 (Docket No. 111-1).)  "Factual assertions in

17   pleadings . . . are considered judicial admissions conclusively

18   binding on the party who made them."  Am. Title Ins. Co. v.

19   Lacelaw Corp., 861 F.2d 224, 226 (9th Cir. 1988).  Starbucks

20   alleges in its Complaint that the Specification Sheet and 26

21   Invoices Amcor issued to Starbucks for the wooden pallets

22   "comprise the contract for the provision and sale of pallets from

23   [Amcor] to plaintiff."  (Compl. ¶ 8.)  Starbucks does not allege,

24   however, that the Disclaimers in the 26 Invoices are valid and

25   enforceable.  Starbucks expressly alleges the "invoices contain

26   fine print with purported disclaimer language, but the

27   disclaimer[s] [are] invalid and ineffective."  (Id.)  Amcor's

28   argument that Starbucks' judicial admissions preclude it from

1   challenging the validity of the Disclaimers is thus

2   unpersuasive.[3]

3            1.   Contract Formation

4            To determine whether the Disclaimers are a part of the

5   parties' contract for the sale of the wooden pallets, the court

6   must evaluate the manner in which the parties formed the

7   contract.  "[T]he rules of contract formation under the [Code] do

8   not include the principle that the parties must agree to all

9   essential terms in order to form a contract."  Steiner v. Mobil

10  Oil Corp., 20 Cal. 3d 90, 105 (1977) (en banc).  Section 2204

11  provides that "[e]ven though one or more terms are left open a

12  contract for sale does not fail for indefiniteness if the parties

13  have intended to make a contract and there is a reasonably

14  certain basis for giving an appropriate remedy."  Cal. Com. Code

15  § 2204(3).  "[T]he omission of even an important term does not

16  prevent the finding under [§ 2204(3)] that the parties intended

17  to make a contract."  Steiner, 20 Cal. 3d at 105 (alterations and

18  citation omitted).

19            To find an enforceable contract, the parties' conduct

20

21            [3]   Amcor's objections to Starbucks' reliance on cases

22  interpreting the UCC and commercial codes of other states is also
    unavailing.  "Case law from other jurisdictions applying

23  California's Commercial Code, the Uniform Commercial Code (UCC),
    or the uniform code of other states, are considered good

24  authority in litigation arising under the California [Code]."
    Israel Aerospace Indus., Ltd. v. Airweld, Inc., Civ. No. 2:11-887

25  WBS CKD, 2012 WL 4834184, at *2 n.3 (E.D. Cal. Oct. 10, 2012)
    (quoting Fariba v. Dealer Servs. Corp., 178 Cal. App. 4th 156,

26  166 n.3 (4th Dist. 2009)); see also U.S. Roofing, Inc. v. Credit

27  Alliance Corp., 228 Cal. App. 3d 1431, 1443-44 (3d Dist. 1991)
    (looking to decisions from other jurisdictions interpreting the

28  UCC to interpret California's Code).

1   must indicate a consummated process of offer and acceptance--and

2   thus, an intent to contract--rather than inconclusive

3   negotiations.  Id. at 104.  Any terms not agreed upon at the time

4   of the contract's formation are filled in by the Code's gap-

5   filling provisions.  Id.; e.g., Cal. Com. Code § 2305 (open price

6   terms), § 2307 (open delivery terms).  "A contract for sale of

7   goods may be made in any manner sufficient to show agreement,

8   including conduct by both parties which recognizes the existence

9   of such a contract."  Id. § 2204(1).  An offer to make a contract

10  may be accepted "in any manner and by any medium reasonable in

11  the circumstances."  Id. § 2206(1)(a).  A buyer's order or offer

12  to buy goods for prompt or current shipment is accepted by the

13  seller's "prompt promise to ship or by the [seller's] prompt or

14  current shipment of conforming or nonconforming goods."  Id.

15  § 2206(1)(b).

16          It is undisputed that, on December 14, 2011, Kerri

17  Hardy, Starbucks' CVRP distribution supervisor, called Rachel

18  Carranza[4] of Amcor and placed an order for wooden pallets to be

19  supplied in accordance with a Specification Sheet that Hardy

20  emailed to Carranza.  (Hardy Decl. ¶ 5 (Docket Nos. 119-20 to -

21  22); Kirsch Decl., May 6, 2016 ("Kirsch I Decl."), Ex. A

22  ("Carranza Dep.") at 42:11-20 (Docket Nos. 119-23 to -39).)  This

23  constituted an offer by Starbucks "to buy goods for prompt or

24  current shipment."  Cal. Com. Code § 2206(1)(b).  Carranza

25  _____

26          [4]   Amcor provides evidence that Carranza had the authority
        to negotiate on Amcor's behalf regarding any contract between
27      Amcor and Starbucks for the sale of the wooden pallets.
        (Carranza Decl. ¶ 34.)  Some of the evidence submitted refers to
28      Carranza by her former name, Rachel Kennedy.

1  acknowledges that, during her conversation with Hardy, Hardy

2  "requested [that Amcor] build the pallets per the specification

3  sheet" that she later emailed to Carranza. (Carranza Dep. at

4  51:1-17.)  The terms of Starbucks' offer therefore included the

5  requirement that the wooden pallets conform to the Specification

6  Sheet.

7         Although Hardy and Carranza did not specifically

8  discuss the 19% kiln-dry requirement that was contained in the

9  Specification Sheet, it is undisputed that Carranza orally

10  represented to Hardy that Amcor would supply the wooden pallets

11  to Starbucks in accordance with the Specification Sheet.  (Hardy

12  Decl. ¶¶ 5-6; Carranza Dep. at 51:1-17.)  Carranza's prompt

13  promise to ship the pallets thus constituted an acceptance of

14  Starbucks' offer and created an enforceable contract between the

15  parties.  See Cal. Com. Code § 2206(1)(b).

16         Between December 2011 and February 2012, Starbucks

17  placed additional orders for wooden pallets pursuant to the

18  Specification Sheet.  (Carranza Decl. ¶ 25 (Docket Nos. 111-33 to

19  -37); e.g., Parikh Decl. Ex. 11 (email dated January 18, 2012

20  from Hardy to Carranza requesting confirmation that Starbucks'

21  first three orders were for 2,000, 3,800, and 1,000 pallets

22  respectively, for a total of 6,800 pallets, and stating that

23  Starbucks "will need to order more pallets").)  It is undisputed

24  that Amcor agreed here that all of the pallet orders during that

25  time would conform to the Specification Sheet.  (Hardy Decl.

26  ¶¶ 5-6.)[5]

27

28         [5]    Carranza also testified that she forwarded the

11

1     Amcor, through Pallets Unlimited, delivered the first

2  shipment of pallets to the OHL Warehouse on December 21, 2011--

3  one week after Hardy placed the initial order for pallets--and

4  continued to deliver the remaining wooden pallets until February

5  17, 2012.  (McCullough Decl. ¶ 6 (Docket No. 119-17 to -19));

6  Parikh Decl. Ex. 10.)  Because the parties' conduct indicates a

7  consummated process of offer and acceptance, Starbucks and Amcor

8  entered into an enforceable contract here for the sale of 9,480

9  wooden pallets made from lumber that was kiln-dried to a moisture

10  content of less than 19%.  See Steiner, 20 Cal. 3d at 104.

11     Both parties refer to the sale of all 9,480 wooden

12  pallets as a single contract, and the court will treat their

13  transaction as such here.  The Code treats an installment

14  contract "which requires or authorizes the delivery of goods in

15  separate lots to be separately accepted" as a single contract.

16  Cal. Com. Code § 2612(1); see also id. § 2612(3) ("Whenever

17  nonconformity or default with respect to one or more installments

18  substantially impairs the value of the whole contract there is a

19  breach of the whole.").  Between December 23, 2011 and February

20  17, 2012, Amcor issued 26 Invoices to Starbucks totaling

21  $400,740.  (Compl. Ex. A.)  It is undisputed that Starbucks

22

23  _____

24  Specification Sheet to Pallets Unlimited and informed Pallets
   Unlimited that the pallets were to be manufactured in accordance
25  with the Specification Sheet.  (Carranza Dep. at 41:13-24, 52:12-
   20.)  Though Pallets Unlimited disputes whether Amcor did in fact
26  provide it with the Specification Sheet, (Anderson Dep. at
   158:14-159:23, 350:21-370:20), Amcor does not dispute that it
27  expected Pallets Unlimited to manufacture the pallets in
   accordance with the Specification Sheet, (e.g., Carranza Dep. at
28  56:18-58:3; Docket No. 119-38 ¶ 7; Docket No. 119-39 ¶ 11).

1  approved and paid the Invoices in full.  (McCullough Decl.

2  ¶¶ 6-7; Coons Decl. ¶ 22.)

3      2.   Section 2207

4      It is undisputed that the parties never discussed the

5  Disclaimers contained in the Invoices and that Starbucks never

6  expressly assented to them.  (McCullough Decl. ¶ 7; Hardy Decl.

7  ¶ 6.)  Starbucks argues that the Disclaimers are invalid because

8  they materially alter the parties' contract of sale pursuant to

9  § 2207(2)(b).  Amcor issued the first Invoice to Starbucks on

10  December 23, 2011, after the first shipment of wooden pallets was

11  delivered on December 21, 2011.  By that time, an enforceable

12  contract for the sale of the pallets already existed between the

13  parties.  See Cal. Com. Code § 2206(1)(b) (seller's prompt

14  promise to ship or prompt shipment of goods is an acceptance

15  creating an enforceable contract for their sale).  The Invoices

16  thus did not constitute letters accepting Starbucks' offer to

17  purchase the wooden pallets.  Since the Invoices were not part of

18  the parties' offer and acceptance establishing the contract of

19  sale, the Disclaimers contained in them constitute additional

20  terms governed by § 2207.  See Steiner, 20 Cal. 3d at 99.

21      California courts treat the application of § 2207 to

22  undisputed facts as an issue of law.  Frank M. Booth, Inc. v.

23  Reynolds Metals Co., 754 F. Supp. 1441, 1446 (E.D. Cal. 1991)

24  (Levi, J.) (collecting cases).  Under § 2207(1), a seller's

25  "definite and seasonable expression of acceptance" or "written

26  confirmation which is sent within a reasonable time" operates as

27  an acceptance of an offer to purchase goods, even if it "states

28  terms additional to or different from those offered or agreed

13

1  upon."  Id. § 2207(1).  If both parties to the transaction are

2  merchants, the additional terms in the seller's acceptance or

3  confirmation automatically become part of the contract unless (a)

4  the offer expressly limits acceptance to the terms of the offer,

5  (b) the additional terms materially alter the contract, or (c)

6  the other party has objected to the additional terms or objects

7  to them within a reasonable time after receiving the acceptance

8  or confirmation.  Id. § 2207(2).  It is undisputed that Starbucks

9  and Amcor are merchants here.  See id. § 2104(1).

10      Subsections 2207(1) and (2) do not apply, however, when

11  "[c]onduct by both parties . . . recognizes the existence of a

12  contract . . . [but] the writings of the parties do not otherwise

13  establish a contract."  Id. § 2207(3).  In such a case, § 2207(3)

14  applies.  Id.  Under § 2207(3), the terms of the parties'

15  contract are those upon which the parties have expressly agreed

16  and any supplemental terms incorporated under any other

17  provisions of the Code.  Transwestern Pipeline Co. v. Monsanto

18  Co., 46 Cal. App. 4th 502, 515 (2d Dist. 1996); Textile

19  Unlimited, Inc. v. A. BMH & Co., 240 F.3d 781, 788 (9th Cir.

20  2001).

21      Subsections 2207(1) and (2) do not apply here.  The 26

22  Invoices did not constitute "definite and seasonable

23  expression[s] of acceptance" under § 2207(1) because Amcor's

24  acceptance occurred when it promised to ship the wooden pallets

25  to Starbucks.  The Invoices were also not written confirmations

26  "intended by the parties as a final expression of their

27  agreement."  Cal. Com. Code § 2202; see Enpro Sys., Ltd. v.

28  Namasco Corp., 382 F. Supp. 2d 874, 884 (S.D. Tex. 2005)

1 ("Certainly, not every written communication after an oral

2 agreement need be characterized as a confirmation. Were it

3 otherwise, it would be impossible to determine where the process

4 of confirming ended." (citation omitted)). "The prevailing rule

5 is that an invoice, standing alone, is not a contract, and a

6 buyer is ordinarily not bound by statements thereon which are not

7 a part of the original agreement." Hebberd-Kulow Enters., Inc.

8 v. Kelomar, Inc., 218 Cal. App. 4th 272, 279 (4th Dist. 2013)

9 (citation omitted).

10      In addition, the parties here agreed that the wooden

11 pallets would conform to the Specification Sheet. The Invoices

12 did not mention any of the requirements contained in the

13 Specification Sheet besides indicating that they were for "54x72"

14 pallets. (See Compl. Ex. A). Because the parties' contract was

15 formed by their conduct and "the writings of the parties do not

16 otherwise establish a contract," § 2207(3) applies to delineate

17 the terms of the contract here. Cal. Com. Code § 2207(3).[6]

18      This conclusion is supported by the official commentary

19 to UCC § 2-207(3), which addresses the precise situation here:

20 "In many cases, as where goods are shipped, accepted and paid for

21 before any dispute arises, there is no question whether a

22 contract has been made. . . . The only question is what terms are

23 included in the contract, and subsection (3) furnishes the

24 governing rule." U.C.C. § 2-207, cmt. 7 (1966); see also

25 Transwestern, 46 Cal. App. 4th at 513 n.1 (noting that California

26

27      [6]    As a result, the court need not address Starbucks'
argument that the Disclaimers materially altered the terms of the
28 contract pursuant to § 2207(2)(b).

1    adopted Uniform Commercial Code ("UCC") § 2-207 without change).

2               3.    <u>The Parties' Course of Dealing</u>

3          The terms of a contract formed pursuant to § 2207(3)

4    are those terms upon which the parties expressly agreed and any

5    supplemental terms incorporated under any other provisions of the

6    Code.   <u>Transwestern</u>, 46 Cal. App. 4th at 515.   Any terms that do

7    not fall under either of these categories "drop out of the

8    contract."   <u>Reynolds Metals Co.</u>, 754 F. Supp. at 1448; <u>see also</u>

9    <u>Textile Unlimited</u>, 240 F.3d at 788 ("Under § 2207(3), the

10    disputed additional items on which the parties do not agree

11    simply 'drop out' and are trimmed from the contract.").

12          Although it is undisputed that Starbucks did not

13    expressly assent to the Disclaimers, Amcor contends that

14    Starbucks' assent can be implied from the parties' course of

15    dealing.   It argues that all of the invoices Amcor had issued to

16    Starbucks since the companies started doing business in 2008

17    contained the same disclaimer language at issue here and that

18    Starbucks never raised any objections to those disclaimers.

19    (Amcor's Mem. at 24-25, 32; Carranza Decl. ¶¶ 7-10; Coons Decl.

20    ¶¶ 5, 8.)   Amcor argues that Starbucks' failure to object

21    constituted its assent to the Disclaimers here.

22          California courts have recognized that "the

23    'supplementary terms' referred to in section 2207(3) may include

24    terms incorporated as a result of the parties' course of

25    dealing."   <u>Transwestern</u>, 46 Cal. App. 4th at 516.   The Code

26    defines an agreement as "the bargain of the parties in fact, as

27    found in their language or inferred from other circumstances,

28    including course of performance, course of dealing, or usage of

1  trade as provided in Section 1303." Cal. Com. Code § 1201(3).

2  Section 1301, in turn, provides that a "course of performance or

3  course of dealing between the parties or usage of trade in the

4  vocation or trade in which they are engaged or of which they are

5  or should be aware is relevant in ascertaining the meaning of the

6  parties' agreement . . . and may supplement or qualify the terms

7  of the agreement." Id. § 1303(d).[7]

8          "A 'course of dealing' is a sequence of conduct

9  concerning previous transactions between the parties to a

10  particular transaction that is fairly to be regarded as

11  establishing a common basis of understanding for interpreting

12  their expressions and other conduct." Id. § 1303(b).  "An

13  inference of the parties' common knowledge or understanding that

14  is based upon a prior course of dealing is a question of fact."

15  In re CFLC, Inc., 166 F.3d 1012, 1017 (9th Cir. 1999).  A genuine

16  dispute surrounding the parties' course of dealing may therefore

17  preclude summary judgment.  See United States v. Sacramento Mun.

18  Util. Dist., 652 F.2d 1341, 1344 (9th Cir. 1981) ("differing

19  views of the intent of parties [may] raise genuine issues of

20  material fact").

21          Amcor argues that the parties "had a three year prior

22  course of dealing [since 2008], which imputed notice to plaintiff

23  of the limited remedy and the limitation of liability provision."

24  (Amcor's Mem. at 32.)  Amcor contends that, between 2008 and

25  _____

26          [7]  "Course of dealing" consists of the parties' relations
    prior to forming the contract at issue, whereas "course of
27  performance" consists of the parties' actions in carrying out the
    contract at issue.  Nanakuli Paving & Rock Co. v. Shell Oil Co.,
28  664 F.2d 772, 794 (9th Cir. 1981).

1  2012, it issued approximately 250 invoices to Starbucks for the

2  sale of various products, including wooden pallets, and that all

3  of those invoice contained the same disclaimers as those

4  contained in the 26 Invoices here.  Amcor has not provided copies

5  of any of the invoices it purportedly issued to Starbucks prior

6  to the transaction at issue in this case.  Instead, Amcor submits

7  two spreadsheets that list the approximately 250 invoices Amcor

8  purportedly issued since 2008.  (See Carranza Decl. ¶ 7, Ex. 28.)

9       Amcor also states that it had sold wooden pallets to

10  Starbucks once before in July and August 2009.  In that

11  transaction, as here, Starbucks ordered pallets pursuant to a

12  specification sheet it provided that included a 19% kiln-dry

13  requirement, and Amcor subcontracted with Pallets Unlimited to

14  manufacture and deliver the pallets to Starbucks.  (Carranza

15  Decl. ¶¶ 11-13, 17; Kirsch Decl., May 27, 2016 ("Kirsch II

16  Decl."), Ex. C at 97:1-25, Ex. O (Docket Nos. 122-4 to -19).)[8]

17  Amcor argues that Starbucks' failure to object to the disclaimers

18  in the hundreds of invoices it received from Amcor since 2008

19  constituted Starbucks' implied assent to the Disclaimers in the

20  26 Invoices here.  (Amcor's Mem. at 32.)

21       California courts have consistently held that "the

22  repeated sending of a writing which contains certain standard

23  terms, without any action with respect to the issues addressed by

24  those terms, cannot constitute a course of dealing which would

25  incorporate a term of the writing otherwise excluded under

26

27      [8]    Starbucks states that the 2009 order involved only 357
pallets and amounted to less than 4% of the 9,480 pallets in the
28  2011 and 2012 transaction at issue.  (See id. Ex. O.)

1   [§ 2207]." _Transwestern_, 46 Cal. App. 4th at 517 (citation

2   omitted).  "[T]he mere exchange of forms containing inconsistent

3   terms, for however long a period, cannot establish a common

4   understanding between the parties as to which set of conflicting

5   terms is part of their contract."  _Id._ at 516; _see also_ _Textile_

6   _Unlimited_, 240 F.3d at 788 ("[M]odern commercial transactions

7   conducted under the U.C.C. are not a game of tag or musical

8   chairs.").

9        In _Transwestern_, the seller added a limitation of

10  liability clause to invoices that it issued to the buyer over a

11  twelve-year period.  The court found that § 2-207(3) applied and

12  considered whether the clause became part of the parties'

13  contracts for sale as a result of their twelve-year course of

14  dealing.  The court rejected the seller's argument that "the

15  exchange of forms containing inconsistent provisions as to

16  liability and remedies, over a long period of time, can 'fairly

17  be regarded as establishing a common basis of understanding'

18  between the parties as to their respective liability and

19  remedies."  _Transwestern_, 46 Cal. App. 4th at 517.  Additionally,

20  the longer such an exchange continues, "the more obvious it is

21  the parties have not reached an agreement over the terms in

22  dispute."  _Id._

23       Amcor attempts to distinguish _Transwestern_ on the

24  ground that the seller "stated in its invoices its acceptance was

25  conditioned on assent to its liability limiters."  _Id._  Section

26  2-207 of the UCC, like Code § 2207, provides that a "definite and

27  seasonable expression of acceptance" containing additional terms

28  operates as an acceptance, unless it is expressly conditioned on

1    the buyer's assent to the additional terms.  U.C.C. § 2-207(1).

2    Amcor's argument is unavailing because the seller's conditioning

3    of acceptance in Transwestern merely led to the conclusion that,

4    as here, the parties did not form a contract under § 2-207(1),

5    but instead, under § 2-207(3).  See Transwestern, 46 Cal. App.

6    4th at 515.

7         In In re CFLC, Inc., 166 F.3d 1012 (9th Cir. 1999), the

8    Ninth Circuit held that, under the UCC, an invoice does not add

9    terms to a contract because "[c]ourse of dealing analysis is not

10   proper in an instance where the only action taken has been the

11   repeated delivery of a particular form by one of the parties" and

12   the parties had not taken any action with respect to the matters

13   addressed by the disputed terms.  Id. at 1017.  The Ninth Circuit

14   reasoned that, because a seller in multiple transactions will

15   typically have every opportunity to negotiate the precise terms

16   it seeks, its failure "or inability to obtain a negotiated

17   agreement reflecting its desired terms strongly suggests that

18   those terms are not a part of the parties' commercial bargain."

19   Id.

20        "[P]ayment on an invoice in accordance with an existing

21   oral contract does not in itself establish assent to the addition

22   of terms to the contract.  For a party's performance to establish

23   assent to a modification or addition of terms, the performance

24   must be related to the proposed modification or addition and

25   differ from the performance already required of the party by the

26   existing contract."  C9 Ventures v. SVC-W., L.P., 202 Cal. App.

27   4th 1483, 1502 (4th Dist. 2012); see also Hebberd-Kulow, 218 Cal.

28   App. 4th at 283 (holding that, absent additional evidence, 33

1   invoices containing a disputed term did not by themselves

2   establish that the term was part of the parties' contract).

3          It cannot be said here that Starbucks' payment of

4   Amcor's prior invoices without objection constituted a course of

5   dealing establishing a common basis of understanding between the

6   parties as to their respective liabilities and remedies.   There

7   is no evidence that, by paying the prior invoices, Starbucks

8   manifested its affirmative assent to the disclaimers in the

9   Amcor's prior invoices.   Rather, Starbucks was merely performing

10  its obligation to pay Amcor for the goods that it purchased,

11  including the wooden pallets that were delivered in 2009.   The

12  payment of those invoices, without more, thus does not constitute

13  Starbucks' assent to the Disclaimers in the 26 Invoices here.

14  See Transwestern, 46 Cal. App. 4th at 517; see also Diamond Fruit

15  Growers, Inc. v. Krack Corp., 794 F.2d 1440, 1444-45 (9th Cir.

16  1986) (holding that to treat the buyer's acceptance and receipt

17  of the goods as assent to the seller's additional terms would be

18  inconsistent with UCC § 2-207 and reinstate the "last shot rule"

19  that § 2-207 intended to abolish).[9]

20         To support its argument, Amcor relies on two inapposite

21  cases, neither of which involves the use of a course of dealing

22  to supplement the terms of the parties' contract under § 2207(3).

23  In Nunes Turfgrass, Inc. v. Vaughan-Jacklin Seed Co., 200 Cal.

24  _____

25         [9]    Nor did the Disclaimers here modify the parties'
    contract.   Although the Code does not require consideration to
26  modify a contract, Cal. Com. Code § 2209(1), "a valid
    modification still requires proof of the other elements essential
27  to the validity of a contract, including mutual assent."   PMC,
    Inc. v. Porthole Yachts, Ltd., 65 Cal. App. 4th 882, 887 (4th
28  Dist. 1998).

1  App. 3d 1518 (5th Dist. 1988), the court analyzed whether a party

2  can limit its damages for a statutory violation.  Id. at 1523

3  (analyzing a violation of California Food and Agriculture Code

4  § 52482).  In Agricola Baja Best, S. De. R.L. de C.V. v. Harris

5  Moran Seed Co., 44 F. Supp. 3d 974 (S.D. Cal. 2014), a seed

6  company attached a booklet that contained warranty disclaimers

7  and a limitation of liability to seed packets that the company

8  sold to a consumer.  See 44 F. Supp. 3d at 980.  The court there

9  held that the warranty disclaimers were unenforceable against the

10  consumer.  Id. at 989.

11       However, the court held that the limitation of

12  liability was enforceable because it was provided in conspicuous

13  large font, capital letters, and bold print.  Id. at 990-91.  The

14  court also observed that "the exterior of the booklet alerted the

15  user it contained important information and directed the user to

16  read the contents before use."  Id. at 991.  Moreover, each

17  order "specifically allowed [the consumer] to return the unopened

18  seed within 30 days for a full refund if it did not agree to the

19  terms."  Id. at 990.

20       Unlike Agricola, the Disclaimers here are not

21  conspicuous because they are located at the bottom of the

22  Invoices and are provided in small print.  (See Compl. Ex. A);

23  Cal. Com. Code § 1201(10) ("Whether a term is 'conspicuous' or

24  not is a decision for the court.").  And, unlike Agricola,

25  Starbucks did not have the right to return the wooden pallets for

26  a full refund if it did not agree with the terms of the

27  Disclaimers.  The cited cases are also inapposite because they

28  involve seed sales.  "Seed sales are unique because seed is a

1   unique chattel." Nunes Turfgrass, 200 Cal. App. 3d at 1533

2   (citation omitted).  "[T]he custom of nonwarranty or limiting the

3   buyer's recovery to the purchase price of the seed has prevailed

4   in the seed industry for many years." Id.  Though Amcor contends

5   that it included the Disclaimers in its Invoices because it did

6   not manufacture the wooden pallets, Amcor offers no evidence that

7   doing so is the custom in its industry or trade.

8        Amcor also contends that, when Starbucks and Amcor

9   first started doing business in 2008, the parties attempted to

10  negotiate the terms of a standard supplier contract to govern

11  Starbucks' purchase of goods from Amcor. (Parikh Decl. Exs. 4-

12  5.)  On March 10, 2008, Christopher Silkworth, a Starbucks

13  employee, emailed a proposed contract to Amcor for review. (Id.

14  Ex. 4 at 004135-36.)  On March 19, 2008, Amcor sent back its

15  proposed revisions, which included the addition of a limitation

16  of liability clause stating: "Neither party will be responsible

17  for any special, incidental or consequential damages arising out

18  of this Agreement." (Id.; Coons Decl. ¶ 3, Ex. 24.)

19       On March 24, 2008, Silkworth responded that, with the

20  exception of an arbitration clause that Amcor had added, Amcor's

21  changes were "acceptable." (Parikh Decl. Ex. 4 at 004151.)

22  Silkworth requested that Amcor make certain additional changes

23  and resubmit their revised contract to Starbucks. (Id.)  It is

24  undisputed that Silkworth never received those revisions, that

25  there were no further communications between Starbucks and Amcor

26  regarding the proposed supplier contract, and that the parties'

27  negotiations ended without them executing an agreement. (Coons

28  Decl. ¶ 4; Silkworth Dep. at 50:22-51:2.)

1          Amcor argues that Silkworth's March 24, 2008 email

2   accepting Amcor's revisions indicates Starbucks' assent to the

3   Disclaimers in the Invoices here.  When asked at his deposition

4   whether he had the authority to execute supplier contracts on

5   behalf of Starbucks, however, Silkworth responded that he "had

6   the authorization to administer the flow of agreements between

7   suppliers and Starbucks," but "never had authorization to sign on

8   Starbucks' behalf any agreements or documents that related to a

9   supplier, any supplier."  (Silkworth Dep. at 21:10-22:6.)

10          As to the proposed revisions that Amcor sent back on

11  March 19, 2008, Silkworth testified that he would not have had

12  the authority to respond to Amcor regarding those changes without

13  first taking them to the proper officials at Starbucks for review

14  and approval.  (Id. at 44:7-25.)  Starbucks also provides

15  evidence that the supplier contract over which the parties were

16  negotiating in 2008 was product-specific and involved "industrial

17  packaging & janitorial supplies," not wooden pallets.  (Id. at

18  54:12-18, Ex. 252.)

19          Contrary to Amcor's assertions, the parties' March 2008

20  negotiation is immaterial because, as Amcor itself acknowledges,

21  no agreement was reached.  The very nature of a negotiation

22  allows a party to change its position regarding a specific term

23  numerous times before the parties finally reach an agreement.

24  Since the parties failed to reach an agreement in 2008, the

25  emails do not evince Starbucks' intent to assent to the

26  Disclaimers at issue here.  In addition, the proposed clause in

27  2008 is different from the Disclaimers at issue because it limits

28  both parties' liability for damages.  The Disclaimers here, by

contrast, limit only Amcor's liability for damages.  And, unlike

the 2008 clause, the Disclaimers here exclude all express and

implied warranties, limit the remedy for any defective pallets to

the replacement of those pallets, and provide that Starbucks

assumes the risk of any loss that arises from the defective

pallets.

Furthermore, "[u]nder well-established precedent, a

single prior transaction cannot constitute a course of dealing."

Trans-Tec Asia v. M/V HARMONY CONTAINER, 435 F. Supp. 2d 1015,

1028-29 (C.D. Cal. 2005) (collecting cases), aff'd, 518 F.3d 1120

(9th Cir. 2008).  This is because the Code defines a course of

dealing as "a sequence of conduct concerning previous

transactions between the parties."  Cal. Com. Code § 1303(b)

(emphasis added); see also id. § 1303(b), U.C.C. cmt. 2 (stating

that course of dealing "is restricted, literally, to a sequence

of conduct between the parties previous to the agreement" at

issue (emphasis added)).  Courts applying the UCC's definition of

"course of dealing" have also emphasized the requirement that

there be a "sequence" of previous transactions.

For instance, in Kern Oil & Refining Co. v. Tenneco Oil

Co., 792 F.2d 1380, 1385 (9th Cir. 1986), the Ninth Circuit held

that the "negotiation of a single prior contract" did not

constitute a course of dealing.  Id. at 1385.  Numerous other

courts have echoed this view.  See Trans-Tec Asia, 435 F. Supp.

2d at 1029 & n.18 (collecting cases); see also id. at 1029

("Thus, Trans-Tec's course of dealing evidence, even if

admissible, fails to raise a triable issue of fact regarding Kien

Hung's surprise or lack thereof.").

1      Because the parties did not have a course of dealing

2  from which Starbucks' assent to the Disclaimers may be inferred,

3  there are thus no genuine issues of material fact regarding the

4  absence of Starbucks' assent to the Disclaimers here.  As a

5  matter of law, therefore, the Disclaimers are not part of the

6  parties' contract for the sale of the wooden pallets.

7  Accordingly, the court must grant Starbucks' motion for summary

8  judgment regarding the unenforceability of the Disclaimers and

9  strike Amcor's thirteenth and forty-ninth affirmative defenses.

10  Amcor is thus excluded from raising the Disclaimers as a defense

11  to Starbucks' claims.

12      B.   Amcor's Motion for Summary Judgment

13           1.   Strict Products Liability and Negligence

14      Starbucks does not oppose Amcor's motion for summary

15  judgment on its strict products liability and negligence claims

16  against Amcor.  (Pl.'s Opp'n at 2 (Docket No. 122).)  The court

17  will thus grant Amcor's motion for summary judgment on those

18  claims.[10]

19           2.   Breach of Contract

20      Amcor seeks judgment as a matter of law that Starbucks

21  is precluded from recovering damages on its breach of contract

22  claim and is limited to the exclusive remedy provided in the

23  Disclaimers.[11]  As discussed above, the Disclaimers are not part

24  _____

25      [10]   This does not affect Starbucks' strict products
   liability and negligence claims against Pallets Unlimited.

26      [11]   Amcor acknowledges that "[t]here is a genuine dispute
   of material fact as to whether the failure to comply with the

27  moisture content in the specifications provided by Starbucks
   caused the resultant mold, as well as a dispute as to whether the

28  moisture content of the pallets was the cause of the mold."

1  of the parties' contract as a matter of law.  Accordingly, the

2  court must deny Amcor's motion for summary judgment on Starbucks'

3  breach of contract claim.

4        3.   Breach of Express Warranty

5        Amcor does not dispute that the "disclaimer in the

6  invoices is ineffective as to the implied warranty of

7  merchantability and any express warranties." (Amcor's Opp'n at

8  5.)  Amcor argues, rather, that Starbucks' claim for breach of

9  express warranty fails because no express warranty exists here.

10        Section 2313 of the Code provides that "[a]ny

11  affirmation of fact or promise made by the seller to the buyer

12  which relates to the goods and becomes part of the basis of the

13  bargain creates an express warranty that the goods shall conform

14  to the affirmation or promise."  Cal. Com. Code § 2313(1)(a).

15  "Any description of the goods which is made part of the basis of

16  the bargain creates an express warranty that the goods shall

17  conform to the description."  Id. § 2313(1)(b).  "It is not

18  necessary to the creation of an express warranty that the seller

19  use formal words such as 'warrant' or 'guarantee' or that he have

20  a specific intention to make a warranty."  Id. § 2313(2).

21        Starbucks contends that "Amcor expressly warranted that

22  the pallets would be 19% kiln dried when it accepted the order

23  for pallets." (Pl.'s Mot. at 7.)  The Specification Sheet

24  contained the requirement that the wooden pallets be constructed

25  with lumber that was kiln-dried to a moisture content of less

26  than 19%. (Compl. Ex. B.)  It is undisputed that Starbucks

27

28  (Amcor's Opp'n at 1 n.1.)

1   provided Amcor with the Specification Sheet and that Carranza, on

2   behalf of Amcor, orally agreed to provide Starbucks with wooden

3   pallets in accordance with the Specification Sheet.  (Hardy Decl.

4   ¶¶ 5-6; Carranza Dep. at 51:1-17.)

5        Amcor's promise that the pallets will conform to the

6   Specification Sheet thus created an express warranty that the

7   pallets would be 19% kiln dried.  See Reynolds Metals, 754 F.

8   Supp. at 1448 (the terms of a contract include express warranties

9   of conformity with standard specifications).  Accordingly, the

10  court must deny Amcor's motion for summary judgment on Starbucks'

11  claim for breach of express warranty.

12            4.   Breach of Implied Warranty of Fitness for a

13                 Particular Purpose

14       Amcor argues that Starbucks' claim for breach of the

15  implied warranty of fitness for a particular purpose fails

16  because no such warranty exists here.  "Where the seller at the

17  time of contracting has reason to know any particular purpose for

18  which the goods are required and that the buyer is relying on the

19  seller's skill or judgment to select or furnish suitable goods,

20  there is . . . an implied warranty that the goods shall be fit

21  for such purpose."  Cal. Com. Code § 2315.  Amcor argues that

22  Starbucks has failed to establish that Amcor knew Starbucks was

23  relying on its skill or judgment in furnishing the pallets in

24  accordance with the Specification Sheet.

25       This argument is without merit.  It is undisputed that

26  Amcor was aware of the particular purpose for which Starbucks

27  would use the wooden pallets.  Carranza states that she "knew

28  that the wooden pallets would be used to store green coffee

1    beans" and that "the ordinary use of wooden pallets was to hold

2    goods for storage, moving, and/or shipping." (Carranza Decl.

3    ¶¶ 28-29.) It is also undisputed that Amcor knew Starbucks was

4    relying on Amcor to furnish the pallets in accordance with the

5    Specification Sheet. Carranza testified that Hardy "requested

6    [that Amcor] build the pallets per the specification sheet," and

7    that Amcor represented to Starbucks it would furnish the pallets

8    in accordance with the Specification Sheet. (Carranza Dep. at

9    51:1-17.)

10        Amcor's own undisputed evidence also establishes that

11   Amcor expected Pallets Unlimited to manufacture the pallets in

12   accordance with the Specification Sheet. (E.g., id. at 56:18-

13   58:3; Amcor's Resp. to Pl.'s Interrog. No. 7 ("[Amcor] expected

14   that the specifications and quality of the Starbucks pallets

15   would meet the . . . Specification Sheet requirements.") (Docket

16   No. 119-38); Amcor's Resp. to Pl.'s RFAs, Set Two, No. 11

17   ("[Amcor] expected the pallet manufacturer to manufacture the

18   pallets as per the specification sheet it had provided.") (Docket

19   No. 119-39).) Because a reasonable factfinder could find that

20   Amcor knew the particular purpose for the wooden pallets and that

21   Starbucks relied on Amcor to furnish the pallets in accordance

22   with the Specification Sheet, the court must deny Amcor's motion

23   for summary judgment on Starbucks' claim for breach of the

24   implied warranty of fitness for a particular purpose.

25            5.   Breach of Implied Warranty of Merchantability

26        Amcor argues that Starbucks' claim for breach of the

27   implied warranty of merchantability fails because there was no

28   breach of that warranty. The Code implies a warranty of

merchantability that goods are "fit for the ordinary purposes for
which such goods are used."  Cal. Com. Code § 2314(2)(c).  The
implied warranty provides for a "minimum level of quality."
Birdsong v. Apple, Inc., 590 F.3d 955, 958 (9th Cir. 2009)
(citation omitted).  "Crucial to the inquiry is whether the
product conformed to the standard performance of like products
used in the trade."  Pisano v. Am. Leasing, 146 Cal. App. 3d 194,
198 (2d Dist. 1983).  This is a factual determination that "may
depend on testimony of persons familiar with the industry
standards and local practices and is a question of fact."  Id.

A plaintiff claiming breach of the implied warranty of
merchantability must show that the product "did not possess even
the most basic degree of fitness for ordinary use."  Mocek v.
Alfa Leisure, Inc., 114 Cal. App. 4th 402, 406 (4th Dist. 2003).
"Such fitness is shown if the product is in safe condition and
substantially free of defects."  Mexia v. Rinker Boat Co., 174
Cal. App. 4th 1297, 1303 (4th Dist. 2009) (internal quotation
marks and citation omitted).

Starbucks provides evidence here that the mold
discovered on the pallets could pose a health hazard to humans
working with them and a quality hazard to any products stored on
them.  (Kirsch II Decl. Ex. I at 177:17-179:17.)  Amcor argues
that the wooden pallets Starbucks returned to Amcor several weeks
or months after they were delivered to the OHL Warehouse were not
moldy.  However, the evidence submitted indicates that the
pallets' moisture content decreased over time as a result of
natural air drying.  (Anderson Dep. at 169:21-171:12; Kirsch II
Decl. Ex. N.)  This would support a reasonable inference that the

1  pallets may not have been able to support mold growth at the time

2  Amcor took them back.

3        Amcor also disputes whether the particular mold that

4  was found on the pallets was dangerous to human health and to

5  products because "some types of mold are not hazardous to humans

6  and would not impact products not meant for consumption."

7  (Amcor's Reply at 5.)  Amcor acknowledges, however, that the

8  cause of the mold may need to be resolved before the court may

9  determine if the implied warranty of merchantability was

10 breached.  It also acknowledges that the cause of the mold "is a

11 disputed fact and cannot be resolved without weighing the

12 evidence and credibility of the parties' witnesses and experts."

13 (Id.)

14       Because genuine issues of material fact exist as to

15 whether the wooden pallets here posed a health and quality hazard

16 and because the determination of this issue may require the

17 resolution of the causation issue, the court must deny Amcor's

18 motion for summary judgment on Starbucks' claim for breach of the

19 implied warranty of merchantability.

20       IT IS THEREFORE ORDERED that:

21       (1) Starbucks' motion for partial summary judgment on

22 the unenforceability of the Disclaimers in Amcor's 26 Invoices,

23 (Docket No. 119), be, and the same hereby is, GRANTED;

24       (2) Amcor's thirteenth and forty-ninth affirmative

25 defenses, (Docket No. 14), be, and same hereby are, STRICKEN and

26 that Amcor be excluded from raising the Disclaimers in the 26

27 Invoices as a defense to Starbucks' remaining claims for breach

28 of contract, breach of express warranty, breach of the implied

1    warranty of merchantability, and breach of the implied warranty

2    of fitness for a particular purpose;

3            (3) Amcor's motion for summary judgment on Starbucks'

4    strict products liability and negligence claims, (Docket No.

5    111), be, and the same hereby is, GRANTED; and

6            (4) Amcor's motion for summary judgment on Starbucks'

7    claims for breach of contract, breach of express warranty, breach

8    of the implied warranty of merchantability, and breach of the

9    implied warranty of fitness for a particular purpose, (Docket No.

10   111), be, and the same hereby is, DENIED.

11   Dated:  June 23, 2016

12   _____
     WILLIAM B. SHUBB

13   UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

32